IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY SOEDER, | ) | CASE NO. 1:13-cv-01252 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Anthony Soeder ("Plaintiff" or "Soeder") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 17.   For the reasons set forth herein, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

On October 5, 2009, Soeder filed applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") alleging a disability onset date of September 1, 1993.

Tr.[1] 13, 129-130, 131-133.  During the administrative hearing Soeder, with his counsel present,

amended his alleged disability onset date to October 5, 2009.  Tr. 13, 35-36.  Since Soeder's date

last insured, June 30, 1996, preceded the amended alleged disability onset date, Soeder's DIB

application was dismissed.  Tr. 13, 35-36, 157.   Soeder alleged disability based on bipolar

---

[1] On January 30, 2014, Defendant filed a Notice of Filing Amended Transcript deleting Exhibit 22F because it did
not pertain to Plaintiff.  Doc. 21.  Transcript references are therefore made to the Amended Transcript.  Doc. 21-1.

disorder, depression, and brain aneurysm.[2]  Tr. 65, 72, 79, 85, 162.  After initial denial by the state agency (Tr. 65-71, 72-78), and denial upon reconsideration (Tr. 79-84, 85-91), Soeder requested a hearing (Tr. 92-94).  On September 16, 2011, Administrative Law Judge Ben Barnett ("ALJ") conducted an administrative hearing.  Tr. 28-56.

In his October 27, 2011, decision, the ALJ determined that Soeder had not been under a disability from October 5, 2009, through the date of the decision. Tr. 10-27.  Soeder requested review of the ALJ's decision by the Appeals Council.  Tr. 8-9.   In seeking review by the Appeals Council, Soeder submitted additional evidence for the Appeals Council's consideration. Tr. 4-5, 653-657 (Exhibit 23F), 658-688 (Exhibit 24F), 689 (Exhibit 25F), and 690-702 (Exhibit 26F).  On April 19, 2013, the Appeals Council denied Soeder's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.    Personal, educational and vocational evidence

Soeder was born in 1967.  Tr. 129, 131.  Soeder is unmarried and does not have children. Tr. 361.  He attended regular classes while in school and graduated from high school.  Tr. 361, 574.  In 1997, Soeder worked briefly as a brass refinisher, which involved refinishing the brass in an office building.  Tr.  48-49.  He reported being fired from his job because the owner's son told the owner that Soeder had stolen equipment.  Tr. 48-49.  Per Soeder, he was incarcerated from September 2010 until February 2011 for violating a condition of his probation[3] that required him to perform community work service.[4]   Tr. 49-50.

---

[2] In a Disability Report – Adult – Form SSA-3368, Soeder reported that, as a result of his conditions, he has blurred vision, sleeps all day, is tired and has terrible hand-eye coordination, writes things backwards at times, and has some serious brain damage.  Tr. 162.

[3] Soeder indicated that he was on probation for fighting with his brother.  Tr. 50.

[4] Soeder indicated that he was unable to perform the community work service.  Tr. 50.

**B.     Medical evidence**

      **a.     Treating source treatment records and opinion evidence**

Soeder received mental health treatment through the Center for Families and Children ("CFC") beginning in November 2010 through at least July 2011.  Tr. 571-591.  He received treatment through various medical providers at CFC.[5]  571-593.

On January 25, 2011, an Adult Diagnostic Assessment was completed.[6]  Tr. 572-582. During that Assessment, Soeder reported being incarcerated in September 2010 with an expected release date in February 2011.  Tr. 572.  He reported a history of cocaine dependence, a history of mood swings, and current alcohol dependence.  Tr. 572, 576.  He indicated that he had participated in two alcohol/drug treatment programs in the past.  Tr. 576.  He reported that alcohol was his main problem and he was interested in receiving in-patient alcohol treatment upon his release from prison.  Tr. 576, 578.  He stated, "I get it all together then I self-destruct." Tr. 572.  He reported feelings of depression, racing thoughts and episodes of hypomania.  Tr. 572, 577, 580.  He denied delusions or hallucinations.  Tr. 572, 580.  He was taking Depakote to help stabilize his mood.[7]  Tr. 572, 575.  He indicated that he had always been impulsive but Depakote helped keep him on an "even keel."  Tr. 578.   When reporting his strengths and weaknesses, Soeder reported that his strength was his ability to stay focused with is weakness being alcohol and drugs.  Tr. 573.  Soeder indicated that, because of a brain hemorrhage in 2003, he had a difficult time remembering things.  Tr. 573.  The Assessor noted that Soeder had a

---

[5] Some providers' names are not legible.  To the extent legible, the names and credentials of the medical providers are noted herein.

[6] There are two signatures on the Assessment.  Tr. 582.  One is listed as "provider" and the other is listed as "supervisor."  Tr. 582.  The names are not legible.  However, it appears that the "provider" was a licensed social worker ("LSW") (hereinafter referred to as "Assessor").  Tr. 582.

[7] He also reported taking but having discontinued other medications, including Neurontin (discontinued by Lorain Correctional); Trazadone (made him sleepy); and Wellbutrin (he could not afford it).  Tr. 575.

difficult time keeping focused and was making goofy faces and jokes during the assessment.  Tr. 580.  Soeder reported that he had not worked in the past five years.  Tr. 574.  He indicated that he could be around people but did not work well with people.  Tr. 574.  He reported that he had been fired from a job because of a confrontation with a supervisor as well as alcohol and drug use.  Tr. 574.  In addition to wanting to receive alcohol treatment upon his release from prison, Soeder indicated that he wanted to continue with mental health treatment.  Tr. 579.  The Assessor's diagnoses included bipolar disorder NOS (per history); alcohol dependence; cocaine dependence, sustained partial remission; and borderline personality disorder.  Tr. 581.  She assessed a GAF score of 55, noting also that Soeder's highest GAF score in the past year was 60.[8]  Tr. 581.

On February 18, 2011, a Psychiatric Evaluation was completed.[9]  Tr. 583-584.  Soeder's relatedness/eye contact was within normal limits.  Tr. 584.  His thoughts were grandiose.  Tr. 584.  His speech and thought process were pressured and tangential.  Tr. 584.   He exhibited mild agitation and restlessness.  Tr. 584.  He was hypomanic.  Tr. 584.  He denied hallucinations and suicidal/homicidal ideation.  Tr. 584.  He had a history of mild paranoia.  Tr. 584.  His cognition and memory were grossly intact.  Tr. 584.  His insight/judgment were limited.  Tr. 584.  Soeder was assessed with bipolar disorder NOS and cocaine/polysubstance dependence with

---

[8] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[9] The signature of the provider completing the evaluation is unclear.  Tr. 584.  However, it appears that the provider completing the evaluation was a clinical nurse specialist ("CNS").  Tr. 584.

reported current remission.  Tr. 584.  His GAF score was assessed as 42.[10]  Tr. 584.  His

Depakote was continued and Seroquel was added.  Tr. 584.

On March 1, 2011, Soeder saw a clinical nurse specialist.  Tr. 587.  Soeder reported being

sober and attending AA.  Tr. 587.  He reported that he had stopped Depakote because he disliked

it; it made his face twitch.  Tr. 587.  He was taking the Seroquel.  Tr. 587.  He reported that his

mind races.  Tr. 587.  His appearance was within normal limits.  Tr. 587.  His thought

process/speech was mildly pressured.  Tr. 587.  His thoughts were grandiose.  Tr. 587.  He was

not psychotic.  Tr. 587.  His mood/affect was labile-hypomanic.  Tr. 587.  He denied

suicidal/homicidal ideation. Tr. 587.  His behavior was "entitled, grandiose, pressured."  Tr. 587.

His insight/judgment was limited.  Tr. 587.  The clinical nurse specialist diagnosed Soeder with

bipolar disorder, noting, however, that he had made some progress.  Tr. 587.  She discontinued

the Depakote and continued the Seroquel.  Tr. 587.

On March 22, 2011, Soeder saw a clinical nurse specialist and reported that he was

"feel[ing] better."  Tr. 586.  He was stable.  Tr. 586. He had a nice place to stay.  Tr. 586.  His

Seroquel had been increased.  Tr. 586.  He was groggy in the mornings.  Tr. 586.  He wanted

Neurontin again for his aches and pains.  Tr. 586.  The clinical nurse specialist noted that

Soeder's mental status had improved since his last visit.  Tr. 586.  His appearance was within

normal limits.  Tr. 586.  His thought process/speech was less pressured.  Tr. 586.  His thoughts

were less grandiose.  Tr. 586.  He was not psychotic.  Tr. 586.  He was mildly hypomanic.  Tr.

586. He denied suicidal/homicidal ideation.  Tr. 586.  He was less agitated.  Tr. 586.  His

insight/judgment was fair.  Tr. 586.  The clinical nurse specialist assessed Soeder as being sober

and having decreased mood lability.  Tr. 586.  She added Neurontin to Soeder's medications.  Tr.

---

[10] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  DSM-IV-TR at 34.

586.  She diagnosed him with bipolar disorder, hypomanic, noting that Soeder had made some progress.  Tr. 586.

On April 19, 2011, Soeder saw a clinical nurse specialist.  Tr. 585.  Soeder reported a stable mood.  Tr. 585.  He reported staying sober but also indicated that that he used marijuana occasionally. Tr. 585.  He indicated that he missed the manic high and cocaine but recognized that a manic state was not sustainable and that there were consequences associated with a manic state.  Tr. 585.   His appearance, thought process/speech, thought content, and behavior were within normal limits.  Tr. 585.  He was not psychotic.  Tr. 585.  His mood was euthymic.  Tr. 585.  He denied suicidal/homicidal ideation.  Tr. 585.  His insight/judgment was "better-fair." Tr. 585.  He indicated that he was mildly groggy in the mornings.  Tr. 585.  The clinical nurse specialist diagnosed Soeder with bipolar disorder I and cocaine/polysubstance dependence with reported remission, noting that Soeder had made significant progress.  Tr. 585.  She assessed Soeder as having a stable mood and being sober.  Tr. 585.  She noted that Soeder struggled with accepting life on life's terms.  Tr. 585.

On June 7, 2011, Soeder was seen again.  Tr. 590.  He had missed an earlier appointment because he was incarcerated for an outstanding disorderly conduct.  Tr. 590, 591.  He had been out of medication for one day.  Tr. 590.  He indicated that the Seroquel made him sleepy.  Tr. 590.  He reported that he had scheduled an appointment for tooth and hip pain he was having. Tr. 590.  His appearance was neat.  Tr. 590.  His thought process was organized.  Tr. 590.  He was engaging. Tr. 590.  He denied substance abuse and suicidal/homicidal ideation.  Tr. 590.  The therapeutic intervention provided during the June 7, 2011, visit included medication education and side effect monitoring and Soeder received assistance with obtaining medications.  Tr. 590.

On June 20, 2011, Soeder was seen as a "walk-in." Tr. 589.  He had missed his appointment earlier in the day.  Tr. 589.  He was neat and clean and had good eye contact.  Tr. 589.  He denied hallucinations.  Tr. 589.  His thoughts were grandiose. Tr. 589.  His mood was "up and down."  Tr. 589.  He was sarcastic and abrupt.  Tr. 589.  He reported sleeping intermittently. Tr. 589.  He reported having used alcohol twice since his release from prison. Tr. 589.  He had no suicidal/homicidal ideation.  Tr. 589.  The therapeutic intervention provided during the June 20, 2011, visit included medication education and side effect monitoring.  Tr. 589.

On July 5, 2011, Soeder was seen again and reported that he "need[ed] meds." Tr. 588. He was neat and clean and had good eye contact.  Tr. 588.  He denied hallucinations.  Tr. 588. He was feeling paranoid.  Tr. 588.  His mood was "fair" but he complained of irritability.  Tr. 588.  His grandiose thoughts had decreased.  Tr. 588.  He complained of racing thoughts, sporadic sleep and feeling groggy in the mornings.  Tr. 588.  He denied substance abuse and had no suicidal/homicidal ideation. Tr. 588.  The therapeutic intervention provided during the July 5, 2011, visit included medication education and side effect monitoring and Soeder received assistance with obtaining medications.  Tr. 588.

On July 18, 2011, a clinical nurse specialist completed and signed a Medical Source Statement: Patient's Mental Capacity ("MSS").  Tr. 592-593.  Dr. Jamie Bukuts, M.D., also signed the MSS.[11]  Tr. 593.  In the MSS, the clinical nurse specialist and Dr. Bukuts opined that Soeder's ability to perform basic mental work activities on a sustained basis was poor in almost

---

[11] The MSS states, "If form completed by LISW, counselor or psychiatric nurse, please have treating Psychiatrist co-sign." Tr. 593.  Dr. Bukuts co-signed the MSS, thus suggesting that the clinical nurse specialist rather than Dr. Bukuts completed the form.

all categories.[12]  Tr. 592.  Although the MSS indicates that "[i]t is important to identify the particular medical or clinical findings . . . which support . . . [the] assessment of any limitations," (Tr. 592), no medical or clinical findings were included in the MSS (Tr. 593).

### b.    Consultative examining psychologist

On February 19, 2010, Dr. Mitchell Wax, Ph.D., saw Soeder for a consultative examination and completed a Disability Assessment Report.  Tr. 361-66.  Dr. Wax's diagnoses included schizoaffective disorder bipolar type and alcohol dependency in remission two months. Tr. 366.  He assessed a GAF score of 31.[13]  Tr. 366.

Dr. Wax opined that Soeder's ability to relate to others was moderately impaired due to his schizoaffective disorder and alcohol dependence.  Tr. 365.  Although Dr. Wax noted that Soeder has 12 friends and talked with 5 of them daily and had good social skills, he also noted that Soeder's inability to provide clear information about himself during the evaluation suggested that he would have difficulty relating to most people on a job.  Tr. 365.

Dr. Wax opined that Soeder's ability to understand, remember, and follow instructions was markedly impaired. Tr. 365.  He indicated that Soeder's estimated IQ based on sensorium cognitive functioning tasks was in the low average range.  Tr. 365.  Dr. Wax noted that Soeder had a history of bipolar disorder and appeared confused during the evaluation.  Tr. 365.  Soeder digressed three quarters of the way through the evaluation and, as he digressed, he started to speak gibberish.  Tr. 365.  Dr. Wax indicated that his opinion with respect to Soeder's

---

[12] There were 21 categories, with rating choices of: "unlimited/very good," "good," "fair," or "poor."  Tr. 592-593. In most categories, Soeder was rated as having a poor ability.  Tr. 592-593.  In some categories, Soeder was rated as having a fair ability or a fair-to-poor ability.  Tr. 592-593.

[13] A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV-TR at 34.

impairment in his ability to understand, remember and follow instructions was based on Soeder's speaking gibberish and not being able to answer questions during the evaluation. Tr. 365.

Dr. Wax opined that Soeder's ability to maintain attention, concentration, and persistence was markedly impaired. Tr. 365. Dr. Wax noted that Soeder's pace was normal but he was not persistent and he could not supply complete information to questions unless probed to do so. Tr. 365. Dr. Wax also noted that Soeder complained that "his mind goes a hundred miles an hour and he can't concentrate" and Soeder appeared mentally confused and disorganized during the evaluation. Tr. 365.

Dr. Wax opined that Soeder's ability to withstand the stresses and pressures associated with day to day work activity was markedly impaired. Tr. 365. Dr. Wax noted Soeder's past alcohol abuse and participation in alcohol treatment programs. Tr. 365. Dr. Wax indicated that Soeder appeared confused during the evaluation, which Dr. Wax stated appeared to be much more due to a brain aneurysm. Tr. 365. Dr. Wax noted that, overall, Soeder had a good ability to perform simple, repetitive tasks, but could not be counted on to attend and concentrate on a regular job. Tr. 365.

### c.    State agency reviewing psychologist

On March 27, 2010, Dr. Caroline Lewin, Ph.D., completed a Psychiatric Review Technique (Tr. 367-380) and a Mental RFC Assessment (Tr. 381-384). In the Psychiatric Review Technique, Dr. Lewin concluded that Soeder had moderate restrictions in activities or daily living; maintaining social functioning; and maintaining concentration, persistence or pace. Tr. 377. There were no episodes of decompensation. Tr. 377.

In the Mental RFC Assessment, Dr. Lewin rated Soeder in 20 categories.  Tr. 381-382.

She found no evidence of limitation or rated Soeder not significantly limited in nine categories.[14]

Tr. 381-382.  She rated Soeder moderately limited in the following nine categories: (1) ability to

carry out very short and simple instructions; (2) ability to maintain attention and concentration

for extended periods; (3) ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; (4) ability to interact appropriately with the

general public; (5) ability to ask simple questions or request assistance; (6) ability to accept

instructions and respond appropriately to criticism from supervisors; (7) ability to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; (8) ability to

respond appropriately to changes in the work setting; and (9) ability to set realistic goals or make

plans independently of others.  Tr. 381-382.  She rated Soeder markedly limited in two

categories: (1) ability to understand and remember detailed instructions; and (2) ability to carry

out detailed instructions.  Tr. 381.

In making her Mental RFC assessment, she did not give much weight to Dr. Wax's

conclusion, noting that, while there were "oddities," Soeder did not appear to have more than

moderate restrictions.  Tr. 385.  She noted that his behavior appeared to be better depending on

the setting, suggesting that he maintained some control of his behavior.  Tr. 384.  She noted that

it was doubtful that Soeder had "more than moderate restrictions of relating, instruction

following, concentration, or stress tolerance" and "[m]entally he should be able to passively

---

[14] The nine categories were (1) ability to maintain socially appropriate behavior and to adhere to basis standards of
neatness and cleanliness; (2) ability to be aware of normal hazards and take appropriate precautions; (3) ability to
remember locations and work-like procedures; (4) ability to understand and remember very short and simple
instructions; (5) ability to perform activities within a schedule, maintain regular attendance, and be punctual within
customary tolerances; (6) ability to sustain an ordinary routine without special supervision; (7) ability to work in
coordination with or proximity to others without being distracted by them; (8) ability to make simple work-related
decisions; and (9) ability to travel in unfamiliar places or use public transportation.  Tr. 381-382.

cooperate with supervision, might be irritable at times with coworkers but would be able to function away from other[s] in a routine setting without rapid change." He should be able to cope with simple instructions, and concentrate short term."  Tr. 384.

**C.    Testimonial evidence**

**1.    Plaintiff's testimony**

Soeder appeared with counsel and testified at the administrative hearing.  Tr. 36-51. Soeder testified that his bipolar disorder and schizoaffective disorder, bipolar type, impacted his ability to work.  Tr. 36.   He indicated that, because of his mental impairments, he gets distracted and mixed up.  Tr. 36.  His ability to follow instructions is impacted by the fact that he gets distracted.  Tr. 36.  For example, he stated that, "if people tell me to do something, I end up getting distracted and having two -- doing two or three different things."  Tr. 36.

Soeder indicated that he has problems sleeping.  Tr. 36-37.  Sometimes he will sleep for days in a row and other times he will be unable to sleep for days.  Tr. 37.  Soeder indicated that he is unable to sleep because of stress and anxiety.  Tr. 37.  He cries sometimes when he is alone or really stressed out.  Tr. 37.  He indicated that, when he is stressed, he has panic attacks.  Tr. 38-39.  While testifying, he noted that he was really stressed, but all right.  Tr. 37, 41.  A brief break was taken so Soeder could get a glass of water.  Tr. 37.  Also, at another point during the hearing, he noted that he was on the verge of having a panic attack.  Tr. 38-39, 44.

He described a bad day as having to leave the house and a good day as being able to stay inside and not be bothered.  Tr. 38, 42.   Soeder indicated that, on average, he does not get out of bed two or three times each week.  Tr. 41.  On a daily basis, he feels like people are out to get him, which makes him not want to go outside.  Tr. 38, 45-46.  However, he does like to ride his bike down to the valley sometimes because there are not a lot of people.  Tr. 42.  He indicated

that, sometimes when he is on a bus, it seems like people are staring at him and are going to get him, so he has had to get off the bus and wait for another bus.  Tr. 44.  His mind races, which makes it difficult for him to concentrate.  Tr. 40.

Because of a lack of funding, at the time of the hearing, Soeder was no longer receiving treatment through CFC and was without medication.  Tr. 40.  He was on a waiting list to receive services through MetroHealth.  Tr. 40-41.

He indicated that, because of his brain injury in 1993, he has blurred vision, poor hand-eye coordination, and his "memory is sporadic."  Tr. 43.

Soeder resides with this brother and his brother's girlfriend. Tr. 39.  He helps out around the house when he is not sleeping.  Tr. 39.  His room is in the basement, which is where he spends most of his time.  Tr. 39.  He is not allowed to use the toaster oven, however, because he forgets that it is on.  Tr. 39-40.

Soeder indicated that he had not been using street drugs since 2008.  Tr. 41.  He does binge drink occasionally when he is in pain or out of his medication.  Tr. 41.  However, he stated he had not been drinking like he had in the past.  Tr. 41-42.

## 2.      Vocational expert's testimony

Vocational expert Gene Burkhammer ("VE") testified at the hearing.  Tr. 51-54.  The VE classified Soeder's brass polishing work as a medium, skilled position.  Tr. 52.  The ALJ then proceeded to ask the VE a series of hypothetical questions.  Tr. 52.

In his first hypothetical, the ALJ asked the VE to assume a hypothetical individual of Soeder's age, education and work experience with no exertional limitations, but who is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any, workplace

changes; limited to no interaction with the public, and only occasional interaction with coworkers and no tandem tasks.  Tr. 52.  In response, the VE indicated that the described individual would be unable to perform Soeder's past work.  Tr. 52.  However, the VE indicated that there would be other jobs in the national economy available to the described individual, including (1) laundry laborer, a medium, SVP 2[15] job, with approximately 600 jobs available regionally, 5,000 jobs in Ohio, and 100,000 nationally; (2) prep cook, a medium, SVP 2 job, with approximately 1,000 jobs available regionally, 15,000 in Ohio, and 500,000 nationally; and (3) housekeeping cleaner, a light, SVP 2 job, with approximately 2,000 jobs available regionally, 30,000 in Ohio, and 500,000 nationally.  Tr. 52-53.

In his second hypothetical, the ALJ asked the VE to assume a hypothetical individual of Soeder's age, education and work experience who cannot sustain sufficient concentration, persistence, or pace to do even simple, routine tasks on a regular and continuing basis for an 8-hour day, 5 days a week for a 40-hour workweek, or the equivalent.  Tr. 53.  The VE indicated that there would be no jobs available in the national economy for the described individual.  Tr. 53.

In response to a question from Soeder's counsel regarding absenteeism, the VE indicated that, if an individual was unable to make it to work two days out of the month on a continuous basis, there would be work available because missing two days each month is generally tolerable.  Tr. 53-54.  However, missing three or more days each month would not be tolerable.  Tr. 54.

---

[15] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[16] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant

---

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 27, 2011, decision, the ALJ made the following findings:[17]

1.  Soeder's date last insured is June 30, 1996.  Tr. 13.  Soeder amended his alleged onset date to October 5, 2009.  Tr. 13.  Soeder's Title II claim is dismissed.  Tr. 13.

2.  Soeder has not engaged in substantial gainful activity since October 5, 2009, the alleged onset date.  Tr. 18.

3.  Soeder has the following severe impairments: encephalomalacia of the right frontal parietal region of the brain due to a remote brain hemorrhage, bipolar disorder, schizoaffective disorder, bipolar type, and a history of alcohol and polysubstance dependence.  Tr. 15.  Soeder has minor impairments, including a fractured toe, dental pain, a skin rash, an accidental laceration, and right hip pain after heavy lifting, which are non-severe because they had no more than a minimal effect on Soeder's ability to perform work-related activities.  Tr. 15.

4.  Soeder does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 15-16.

5.  Soeder has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to

---

[17] The ALJ's findings are summarized herein.

> simple routine repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions with few, if any, workplace changes, limited to no interaction with the public, and limited to occasional interaction with co-workers, with no tandem tasks.  Tr. 17-20.

6.     Soeder is unable to perform any past relevant work.  Tr. 20.

7.     Soeder was born in 1967, and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.[18]  Tr. 21.

8.     Soeder has at least a high school education and is able to communicate in English.  Tr. 21.

9.     Transferability of job skills is not material to the determination of disability.  Tr. 21.

10.     Considering Soeder's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Soeder can perform, including laundry laborer, prep cook, and housekeeping/cleaner.  Tr. 21-22.

Based on the foregoing, the ALJ determined that Soeder had not been under a disability from September 1, 1993,[19] through the date of the decision.  Tr. 22.

## V. Parties' Arguments

### A.     Plaintiff's arguments

Soeder presents three arguments for review.  First, he argues that the ALJ improperly weighed the opinions of treating physician Dr. James[20] Bukuts and consulting physician Dr. Mitchell Wax.  Doc. 20, pp. 8-11.  He argues that those opinions were sufficiently supported by

---

[18] The ALJ's statement with respect to Soeder's age on the alleged disability onset date appears to be based on the original 1993 alleged disability onset date rather than the 2009 amended alleged disability onset date.  Soeder does not raise an issue with respect to the ALJ's finding regarding his age on the alleged disability onset date.

[19] At the end of his decision, the ALJ referred to the original alleged disability onset date as opposed to the amended alleged disability onset date.  Soeder does not raise an issue with respect to the ALJ's reference to the original alleged disability onset date.

[20] Plaintiff's Brief indicates that Dr. Bukuts' first name is James.  Doc. 20, p. 8.  However, on the MSS signed by Dr. Bukuts, it appears that Dr. Bukuts' first name is Jamie.  Tr. 593.  The ALJ also states that Dr. Bukuts' first name is Jamie.  Tr. 19.

the record and, therefore, the ALJ's reasons for providing "little weight" to those opinions are not good reasons and not supported by substantial evidence.  Doc. 20, pp. 8-11.

Second, Soeder argues that the ALJ erred because he failed to find that his ischemic great toe or vascular insufficiency of the right leg was a severe impairment and failed to account for any exertional limitations in the RFC.  Doc. 20, pp. 11-14.

Third, Soeder argues that a sentence six remand is warranted for consideration of "new" and "material" evidence.  Doc. 20, pp. 14-16.  Soeder argues that the "new" evidence provides further proof that the RFC should have included limitations to account for physical limitations and/or provides further evidence in support of the opinions of Dr. Bukuts and Dr. Wax.  Doc. 20, p. 16.

## B.     Defendant's arguments

In response to Soeder's first argument, the Commissioner argues the ALJ properly considered the medical opinions of Dr. Wax and Dr. Bukuts and determined that those opinions were entitled to "little weight" because they were not well-supported by the medical evidence, including CFC treatment notes; appeared to be based on Soeder's subjective complaints and/or appeared to be based on Soeder's attempt to portray himself as functionally disabled.  Doc. 22, pp. 14-20.

Next, the Commissioner argues that Soeder failed to meet his burden of demonstrating severe physical impairments.  Doc. 22, pp. 20-21.  The Commissioner points out that, during the September 16, 2011 hearing, Soeder's counsel indicated that Soeder was disabled due to mental, not physical, impairments.  Doc. 22, p. 20.  Also, the Commissioner notes that Soeder bases his physical impairment argument primarily on evidence that was not submitted to the ALJ.  Doc. 22, pp. 20-21.

Finally, the Commissioner argues that Soeder has failed to show that a sentence six remand is warranted.  Doc. 22, pp. 21-23.  The Commissioner argues that evidence that pre-dates the ALJ's decision is not "new."  Doc. 22, p. 22.  The Commissioner also argues that evidence that post-dates the ALJ's decision is not "material" because it does not relate to the relevant period, which ended on October 27, 2011, nor is there a reasonable probability that the ALJ would have reached a different decision had the evidence been presented to him.  Doc. 22, pp. 22-23.  Further, the Commissioner argues that Soeder has failed to satisfy the "good cause" requirement for a sentence six remand.  Doc. 22, p. 23.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20*03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 19*89).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 20*06) (citing 42 U.S.C. § 405(g)).

Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 20*03).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in

evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **A sentence six remand is not warranted**

Soeder requests a remand pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of evidence not presented to or considered by the ALJ. Doc. 20, pp. 14-16. More specifically, he requests remand for consideration of the following "new" records: (1) CFC treatment notes for treatment provided between February 18, 2011, through August 15, 2011 (Ex 23F, Tr. 653-657); (2) MetroHealth treatment notes from (a) June 2, 2011 (dental) (Ex 24F, Tr. 660-663), (b) September 26, 2011 (leg/thigh symptoms) (Ex 24F, Tr. 664-683), (c) October 22, 2011 (refill) (Ex 24F, Tr. 684-688); (3) July 18, 2011, Pharmacologic Management/Psychiatric Progress Note (Ex 25F, Tr. 689); (4) MetroHealth October 22, 2011, emergency department notes (complaints of right leg pain/refill) (Ex 26F, Tr. 690-693); and (5) MetroHealth May 26, 2012, emergency department notes (toothache) (Ex 26F, Tr. 694-702).[21] Doc. 20, p. 15 (referencing Ex 23Fthrough 26F, Tr. 653-702). Soeder submitted these "new" records to the Appeals Council but the Appeals Council did not remand the matter. Doc. 20, p. 15.

The Sixth Circuit has repeatedly held that where, as here, the Appeals Council denies review and the ALJ's decision becomes the Commissioner's decision, review by the District Court is limited to the evidence presented to the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citing *Cline v. Comm'r of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996)); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human*

---

[21] Although referenced in his statement of facts, Soeder does not clearly articulate how the records contained in Exhibit 26F are "material." Thus, the Court need not analyze whether a sentence six remand is warranted based on those records. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ( "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

*Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).   The statute permits only two types of remand: a sentence four remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision and a sentence six remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See, e.g., Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context; it only can consider such evidence in determining whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 512-513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

        The plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) to demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for his failure to present this evidence in the prior proceeding.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276-278 (6th Cir. 2010) (although the material that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit materials and that the evidence was "material.").  Evidence is "*new* only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted and emphasis supplied).  "[E]vidence is *material* only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted and emphasis supplied).  "A claimant shows *good cause* by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.* (internal quotations and citations omitted and emphasis supplied); *see also Willis v. Secy's of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984) (A "court may remand the case only

when the claimant shows that (1) new and material evidence is available and (2) good cause is shown for failure to incorporate such evidence into the prior proceeding.").  (citing 42 U.S.C. § 405(g)).

Soeder claims that the records are "new" because they relate to medical treatment immediately before and after the administrative hearing.  Doc. 20, p. 15.  He also argues that he had good cause for his late production of the evidence because the records were not yet in existence at the time of the hearing or not yet available.  Doc. 20, p. 15.  Finally, he argues that the records are material because the "new" evidence provides further proof that the RFC should have included limitations to account for physical limitations and/or provides further evidence in support of the opinions of Dr. Bukuts and Dr. Wax.  Doc. 20, p. 16.

More particularly, Soeder argues that a July 18, 2011, CFC mental health treatment record reflecting complaints of pressured speech, a manic mood, and irritability is "new" and that it is "material" because it provides support for Dr. Bukuts' and Dr. Wax's opinions.  Doc. 20, p. 16 (relying on Tr. 689, Exhibit 25F[22]).   However, the July 18, 2011, treatment record is dated approximately two months prior to the September 16, 2011, administrative hearing.  Tr. 28, 689.  Thus, the July 18, 2011, treatment record is not "new" for purposes of a sentence six remand.

Soeder also has not provided "good cause" for his failure to incorporate this evidence into the prior proceeding. He argues only that "[g]ood cause for the late production of the evidence is apparent, since the records were not yet in existence at the time of the hearing or not yet available."  Doc. 20, p. 15.  Yet, the July 18, 2011, treatment record is dated prior to the administrative hearing and it is also dated the same date as the MSS signed by Dr. Bukuts and a

---

[22] Exhibit 25F is dated July 18, 2011.  Tr. 689.  It is a duplicate of a document also contained in Exhibit 23F.  Tr. 657.  Exhibit 23F also contains treatment notes from CFC for the period of February 18, 2011, through August 15, 2011.  Tr. 653-657.

clinical nurse (Tr. 689, 592-593), which was submitted as part of the prior proceedings.  In light

of the foregoing, Soeder has failed to demonstrate "good cause" as to why the July 18, 2011,

treatment record was not in existence or available to him for inclusion into the record at an

earlier date, he has not demonstrated ".  *Foster*, 279 F.3d at 357 (6th Cir. 2001) ("The burden of

providing a complete record . . . rests on the claimant.") (*citing Landsaw v. Sec'y of Health &

Human Servs.,* 803 F.2d 211, 214 (6th Cir.19*86)).

Soeder also argues that September 26, 2011, records that show that he had pain,

weakness and difficulty ambulating and short distance claudication provide support for his claim

that he had a severe impairment of his toe/leg.  Doc. 20, p. 16 (relying on Tr. 660-687, Exhibit

24F[23]).   Even assuming Soeder could demonstrate that the records were "new" and that he had

"good cause" for not submitting the records during the prior proceedings,[24] Soeder is unable to

demonstrate that there is a reasonable probability of a different outcome if the September 26,

2011, emergency room records were considered. Therefore the records are not "material."  For

example, while the treatment notes from the September 26, 2011, emergency room visit reflect

right leg and hip pain with short distance claudication over the prior couple days and an

assessment of vascular insufficiency right leg (Tr. 664-665), those same notes also include a

notation that Soeder had previously been seen for a right blue great toe, treated with Heparin, the

symptoms cleared and he was sent home.  Tr. 664.  Also, it was noted that the short distance

claudication was a new symptom (Tr. 664) and, on examination, the findings were generally

---

[23] The September 26, 2011, emergency department record is contained within Exhibit 24F at Tr. 664-681.  Also, included in Exhibit 24F is a June 2, 2011, MetroHealth treatment notes for a "dental" visit (Tr. 660-663) and an October 22, 2011, MetroHealth emergency department note indicating that Soeder presented for an unspecified a refill (Tr. 684-688). It appears that Soeder's argument is based on the September 26, 2011, portion of Exhibit 24F.

[24] The September 26, 2011, records pre-date the ALJ's October 27, 2011, decision.  Yet, Soeder makes no argument that he attempted to submit the records prior to the issuance of the ALJ's decision.  Thus, Soeder may not be able to satisfy the "good cause" requirement.  Additionally, although the records post-date the administrative hearing, they pre-date the ALJ's decision and therefore may not constitute "new" records under sentence six.

normal, including findings that Soeder had full range of motion in all extremities and his strength and gait were normal (Tr. 665).[25]

Moreover, to the extent that Soeder claims that the records relate to his condition at the time of the hearing and therefore are "material" (Doc. 20, p.16), since the September 26, 2011, emergency room records post-date the administrative hearing, his assertion is inaccurate. Further, "a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing." *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio Jan. 18, 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.,* 974 F.2d 680, 685 (6th Cir.1992).  If Soeder's toe/leg condition had seriously worsened after the administrative hearing, an appropriate remedy would be initiation of a new claim for benefits as of the date that his condition rose to the level of a disabling impairment.  *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Based on the foregoing, Soeder is not able to demonstrate that the evidence he relies upon for a sentence six remand is "new" and "material" and/or he has failed to demonstrate "good cause" for obtaining and presenting that evidence as part of the prior proceedings.  Accordingly, Soeder is not entitled to a sentence six remand for consideration of additional evidence not submitted to the ALJ and the Court will not consider any evidence that was not in the record when the ALJ issued his decision.

**B.      The ALJ properly considered and weighed the medical opinion evidence and the RFC is supported by substantial evidence**

"[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. Appx. 149, 157 (6th Cir. 2009).  The regulations make clear that a

---

[25] On examination, it was noted that Soeder's right foot was warm but there was no skin discoloration.  Tr. 665.

claimant's RFC is an issue reserved to the Commissioner and the ALJ is to assess a claimant's

RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§

404.1545(a); 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439

(6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately

determines a Plaintiff's RFC").

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth

in 20 C.F.R. § 404.1527.  20 C.F.R. § 404.1527(e)(2).  Those factors include the examining

and/or treatment relationship, length, nature and extent of treatment relationship, supportability

of the opinion, consistency of the opinion with the record as a whole, and specialization. 20

C.F.R. § 404.1527(c)(1)-(6).

Soeder challenges the weight the ALJ provided to the opinions of Dr. Bukuts and Dr.

Wax and argues that the ALJ improperly relied upon the opinion of Dr. Lewin.  Doc. 20, pp. 8-

11.  With respect to those medical opinions, the ALJ stated,

> As for the opinion evidence, Dr. Wax reported that claimant's ability to relate to
> others was moderately impaired.  He also opined that the claimant's ability to
> understand, remember, and follow instruction, maintain concentration, persistence
> and pace, and withstand work stress were all markedly impaired.
>
> A state agency consultant, Caroline Lewin, PhD, reported on March 27, 2010, that
> the claimant had moderate restrictions in relating, instruction following,
> concentration, and tolerating stress; he should be able to passively cooperate with
> supervision; and he would be able to function away from other(s) in a routine
> setting without rapid change.  Dr. Lewin opined that the claimant could not cope
> with simple instructions and concentration "short term" (EX 12F).  Significantly,
> she noted that the claimant's "behavior is better when behavior is not the issue"
> (see analysis below).
>
> Finally, the record contains a July 18, 2011, medical source statement prepared by
> a certified nurse practitioner at CFC and also signed by the claimant's treating
> psychiatrist at that facility, Jamie Bukuts, MD.  This report indicates that the
> claimant has fair ability to understand, remember and carry out simple job
> instructions, but poor ability to complete a normal workday/workweek, deal with
> work stress, work in proximity with others without becoming distracted, interact

with others, maintain regular attendance, respond to workplace changes, maintain attention and concentration, and follow work rules (EX 18F).

I find that the opinion of Dr. Wax is entitled to little weight because it is not supported by the medical evidence and because it appears to be based on the claimant's intentional behavior, which I find more likely than not was an attempt to portray himself as functionally disabled.

Similarly, I find the opinion of the nurse practitioner/Dr. Bukuts is entitled to little weight because it is not supported by CFC treatment notes, and it also appears to be based on claimant's subjective statements.

I find that the opinion of Dr. Lewin is entitled to great weight because it is consistent with the medical record as a whole.

Tr. 19-20.

Soeder claims that Dr. Bukuts is a treating physician with a longitudinal view of Soeder's medical history and limitations and that Dr. Bukuts treated Soeder from November 2010 through at least July 2011, (Doc. 20, p. 9 (relying on Tr. 571-591, 698), and argues that the ALJ failed to adhere to the "treating physician rule" when providing "little weight" to the Medical Source Statement ("MSS") signed by Dr. Bukuts and a clinical nurse.  Doc. 20, pp. 8-11.  The records upon which Soeder relies do not support his claims. While Exhibit 17F contains treatments notes and assessments from CFC[26] (Tr. 571-591), Dr. Bukuts' signature or credentials do not appear on those records.

"The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once . . . ." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 507 (6th Cir.

---

[26] Plaintiff also cites to Tr. 698 to support his claim that Dr. Bukuts was a long time treating psychiatrist.  Doc. 20, p. 9.  However, Tr. 698 consists of a record from MetroHealth with a provider by the name of Jason Lu.  Tr. 698. To the extent that Plaintiff intended to reference Tr. 689, a July 18, 2011, mental health treatment note, as discussed above, the July 18, 2011, treatment record is not for this Court's consideration because it was not submitted to the ALJ.  Moreover, the provider of the services on that date was a CNS, not an M.D..  Tr. 689.

2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  In those instances where a physician is not a treating source, *Wilson* has been found to be inapplicable.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Kornecky*, 167 Fed. Appx. at 507; *see also Daniels v. Comm'r of Soc. Sec.*, 152 Fed. Appx. 485, 490 (6th Cir. 2005).  Soeder does not assert that the ALJ's reference to Dr. Bukuts as a "treating psychiatrist" elevated Dr. Bukuts' opinion to that of a treating physician and the treatment records do not support Soeder's claim that he had an ongoing treatment relationship with Dr. Bukuts such that the MSS co-signed by Dr. Bukuts should be entitled to special deference under the "treating physician rule." Accordingly, the Court finds that, contrary to Soeder's argument, the ALJ did not violate the treating physician rule when considering and weighing Dr. Bukuts' opinion. *See Daniels*, 152 Fed. Appx. at 490-491 (noting that, even though the ALJ casually referred to a doctor as a treating source, the ALJ's failure to specifically address that doctor's opinion was not surprising because the doctor did not meet the requirements under the regulations to be defined as a treating physician); *see also Smith*, 482 F.3d at 876 (finding that doctors who had examined the claimant on a single occasion or treated claimant on a very limited basis did not constitute the type of ongoing treatment relationship contemplated by the "treating physician rule").

Soeder also contends that the ALJ's reasons for providing "little weight" to Dr. Bukuts' opinion are unsupported by the record, arguing that "the evidence shows that the record of the Center for Families and Children fully support Dr. Bukuts and Dr. Wax's opinions."  Doc. 20, p. 9.  However, the Court finds that the ALJ's reasons for providing "little weight" to Dr. Bukuts' MSS are "good reasons" that are supported by the record.  For example, the ALJ considered the fact that the limitations contained in Dr. Bukuts' MSS were not supported by the actual treatment notes from CFC.  Tr. 20; *See* 20 C.F.R. § 404.1527(c)(3)-(4) (supportability and consistency of

the opinion are factors to be considered when weighing medical opinions).  A review of the CFC

records shows that this finding is supported by the record.   Although Soeder's treatment records

reflect his mental impairments, and the fact that he experienced symptoms relating to those

impairments, progress notes show that Soeder was showing improvement in his symptoms.  For

example, on March 22, 2011, Soeder's thoughts were less grandiose, his speech was less

pressured, and he was less agitated.  Tr. 586.  In April 2011, his mood was euthymic and his

behavior was within normal limits.  Tr. 585.  Consistent with these symptoms, his progress notes

showed "some progress" in March 2011 (Tr. 586-587) and "significant progress" in April 2011

(Tr. 585).[27]  As found by the ALJ, Dr. Bukuts' findings of poor ability in numerous work-related

functions are not supported by the CFC treatment notes themselves.  Moreover, since Dr. Bukuts

did not provide any medical or clinical findings to support the assessment in the MSS, the ALJ's

finding that the opinion appeared to be based on Soeder's subjective statements (Tr. 20) is

reasonable and supported by the evidence. Since the ALJ explained the basis for providing "little

weight" to Dr. Bukuts' opinion and his reasons are supported by substantial evidence, the Court

finds no error in the ALJ's consideration of and weight provided to the July 18, 2011, MSS

signed by a clinical nurse and Dr. Bukuts.

Soeder appears to argue that, because consultative examining psychologist Dr. Wax and

Dr. Bukuts' opinions are similar, the ALJ was required to provide more weight to those opinions.

Doc. 20, p. 10.  However, Dr. Wax saw Soeder for a one-time evaluation and was not a treating

physician.  Therefore, his opinion was not entitled to special deference under the "treating

physician rule."  Moreover, the ALJ explained his reasons for providing "little weight" to Dr.

---

[27] In June and July 2011, progress notes reflect some increased negative symptoms such as irritability, racing thoughts, and sporadic sleep.  Tr. 588-589.  However, notes from June and July 2011 reflect that Soeder had used alcohol (Tr. 589), missed an appointment due to being incarcerated and had been without medication (Tr. 590), and reported "need[ing] meds" (Tr. 588).

Wax's opinion, i.e., his opinion was not supported by the medical evidence and it appeared to be based on claimant's intentional behavior (Tr. 20), and Soeder has failed to demonstrate that those reasons are not supported by the evidence.

Soeder has failed to demonstrate that, because the ALJ provided greater weight to the opinion of Dr. Lewin than to that of Dr. Wax, remand of these proceedings is required. Consistent with the regulations, the ALJ considered and weighed Dr. Lewin's opinion and explained the basis for the weight provided to Dr. Lewin's opinion.  *See* 20 C.F.R. § 404.1527(e)(2)(i) (recognizing that non-examining state agency consultants are "highly qualified" and are "experts in Social Security disability evaluation."). Soeder argues that the ALJ's reliance upon Dr. Lewin's opinion was faulty because "Dr. Lewin only opines that Plaintiff should be able to cope with simple instructions, and concentrate 'short term' (Tr. 384) [but] [i]t is unknown what Dr. Lewin considers 'short term' and whether that definition equals the requirements of substantial gainful activity." (Doc. 20, p. 10). This argument is without merit.  Dr. Lewin did not only opine that Soeder should be able to cope with simple instructions and concentrate short term; she also provided other opinions, including her opinions that "[i]t is doubtful that he [Soeder] has more than moderate restrictions of relating, instruction following, concentration, or stress tolerance" and "would be able to function away from other[s] in a routine setting without rapid change."  Tr. 384.   Moreover, the determination of an individual's RFC is an issue reserved to the Commissioner. *See also Coldiron*, 391 Fed. Appx. at 439 ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC").

As discussed, the ALJ provided sufficient reasons for the weight provided to the medical opinion evidence and those reasons have been shown to be supported by substantial evidence.

Accordingly, Soeder's claim that the ALJ erred in the weight assigned to the opinions of Dr. Bukuts, Dr. Wax, and/or Dr. Lewin is without merit.

**C.  The ALJ did not err at Step Two**

Soeder argues that the ALJ erred at Step Two because he failed to find that his ischemic great toe and/or vascular insufficiency of the right leg was a severe impairment and failed to account for any exertional limitations in the RFC.  Doc. 20, pp. 11-14.

At Step Two, the claimant must show that he has an impairment that significantly interferes with his ability to do basic work activities. See 20 C.F.R. § 416.920(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 416.921.

Plaintiff carries the burden of proving the severity of his impairments. *Allen v. Apfel*, 3 Fed. Appx. 254, 256 (6th Cir. 2001) (*citing Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988)). While Step Two has been described as a "*de minimis* hurdle," the severity requirement can be employed to screen out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-863 (citation omitted). A claimant's impairment will be construed as non-severe when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 90 (6th Cir.1985) (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).

In his decision, the ALJ acknowledged Soeder's treatment for a variety of physical impairments, including a fractured toe . . . and right hip pain after heavy lifting."  Tr. 15 (referencing Ex 14-15F and Ex 19-21F, which includes a July 14, 2011, medical record for right foot pain (Ex 19F, Tr. 594) and July 19, 2011, emergency room records reflecting treatment for ischemic great toe (Ex 21F, Tr. 614-623)).  Accordingly, Soeder's claim that the ALJ failed to even acknowledge his physical impairments (Doc. 20, p. 12) is without merit.

Furthermore, Soeder has not met his burden of demonstrating a severe physical impairment. In his disability application, Soeder alleged disability based on bipolar disorder, depression, and brain aneurysm; he did not allege disability based on a toe or leg impairment. Tr. 65, 72, 79, 85, 162.   Moreover, during the administrative hearing, Soeder's counsel made clear that Soeder was claiming disability based on mental, not physical, impairments, stating, in part, "the impairments here, Your Honor, that are disabling, are psychiatric impairments . . . . [a]nd he has a history of traumatic brain injury back in 1993.  Brain MRI's do show abnormalities . . . [b]ut the, disabling impairments, Your Honor, based upon my reading of the record, are the, psychiatric.  That goes to bipolar disorder and schizoaffective disorder."[28] Tr. 33-34.

Moreover, to support his claim that the ALJ failed to recognize a severe impairment in his lower extremity, Soeder relies primarily upon medical records submitted as "new" evidence, which, as discussed above, are not before this Court for its review.  Doc. 20, p. 12 (relying on Tr. 660-687).   Otherwise, Soeder points to one record of treatment for ischemic great toe,[29] which is

---

[28] Soeder walked about a mile to his psychological consultative evaluation with Dr. Wax.  Tr. 361.  During that evaluation, Soeder reported having physical problems, including a brain aneurysm in 1993 and eye/hand coordination problems. Tr. 361, 366.  He also noted that he had been to the emergency room for having cut his leg but did not report a toe or leg impairment.

[29] Soeder notes that "After Care Instructions" from the July 19, 2011 emergency room visit reflect ischemic great toe-left (Doc. 20, p.6 (citing Tr. 620)) but that corresponding July 19, 2011, emergency room treatment notes reflect

a July 19, 2011, Lakewood Hospital emergency room visit.  Tr. 614-620.  On discharge, he was instructed to follow up with a vascular doctor.  Tr. 619, 620.   However, there is no indication in the record whether Soeder followed those instructions.[30]  Tr. 619, 620.   Additionally, Soeder does not point to medical opinion evidence that supports functional limitations based upon lower extremity impairments.

Based on his limited treatment for his physical impairments and lack of medical opinion evidence to support any functional limitations based upon those impairments, Soeder has not demonstrated that his physical impairments are severe nor has he demonstrated that the ALJ erred in not finding his ischemic great toe or vascular insufficiency of the right leg to be severe impairments or by failing to account for exertional limitations in the RFC.  Accordingly, reversal and remand is not warranted based on the ALJ's consideration and treatment of Soeder's physical impairments, including ischemic great toe or vascular insufficiency of the right leg.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  July 24, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

that the actual toe involved was Soeder's right toe, not his left (Doc. 20, p. 6, n.2 (citing Tr. 614)).  The "After Care Instructions" reflect that "[t]he ischemic foot is also referred to as having arterial insufficiency."  Tr. 620.

[30] In the statement of facts section of his Brief, Soeder also references Tr. 594, which is a July 14, 2011, Cleveland Clinic discharge summary that reflects a finding of right foot pain, with a recommendation to follow up with the vascular medicine department.  Doc. 20, p. 6.